Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
*Attorney for Plaintiffs Novo Nordisk A/S and*
*Novo Nordisk Inc.*

*Additional counsel listed on signature pages*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOVO NORDISK A/S, NOVO NORDISK INC. | CASE NO. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| | DEMAND FOR JURY TRIAL |
| AIOS INC d/b/a FELLA HEALTH AND DELILAH, FELLA MEDICAL GROUP P.A., FELLA MEDICAL GROUP P.C., | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

THE PARTIES .................................................................................................... 4

JURISDICTION AND VENUE ......................................................................... 5

DIVISIONAL ASSIGNMENT ........................................................................... 5

FACTS ENTITLING NOVO NORDISK TO RELIEF ..................................... 5

    A.    Novo Nordisk ........................................................................ 5

    B.    Novo Nordisk's Semaglutide Products .................................. 6

    C.    The FDA Drug Approval Process .......................................... 8

    D.    Compounded Drugs ............................................................... 9

    E.    Government Warnings of Risks of Compounded Semaglutide ........................... 10

    F.    Other Warnings About the Risks of Compounded Semaglutide ........................ 14

    G.    Safety Risks of Unapproved Compounded Drugs ................. 16

    H.    Adverse Events Reported After Taking Compounded Semaglutide Drugs .......... 19

    I.    Governing State and Federal Law .......................................... 20

        1.    The Lanham Act ............................................................ 20

        2.    California False Advertising Law .................................. 20

        3.    California Unfair Competition Law ............................... 20

        4.    California Law Governing Corporate Practice of Medicine ................... 21

II.    Fella Violates California Law by Engaging in the Unlicensed Corporate Practice of Medicine ............................................ 24

    A.    Both Fella and Fella Medical Group Are Owned and Controlled by Fella's Non-Physician CEO ........................... 24

    B.    Fella's Exertion of Control and Undue Influence over Telehealth Physicians' Practice of Medicine ..................... 25

        1.    Fella's Non-Physician Employees Regularly Provide Medical Advice ... 25

        2.    Fella Manipulated Patient Prescriptions En Masse .................... 32

    C.    Fella Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication ......................... 41

III.    Fella Violates the Lanham Act and California Law by Engaging in False Advertising in
        Connection With its Sale of Unapproved Compounded Drugs ........................................ 41

FIRST CAUSE OF ACTION ................................................................................................ 49

SECOND CAUSE OF ACTION ............................................................................................ 50

THIRD CAUSE OF ACTION ................................................................................................ 51

FOURTH CAUSE OF ACTION ............................................................................................ 53

PRAYER FOR RELIEF ........................................................................................................ 53

COMPLAINT

# INTRODUCTION

1.      Plaintiffs Novo Nordisk A/S and Novo Nordisk Inc. (collectively, "Novo Nordisk") bring this Complaint in the interest of public safety and honest competition.

2.      Defendants Aios Inc. (d/b/a Fella Health and Delilah), Fella Medical Group P.A. and Fella Medical Group P.C. (collectively, "Fella Medical Groups") have jeopardized the public health and unfairly competed with Novo Nordisk by violating state and federal law in furtherance of their marketing of mass produced compounded weight loss drugs.

3.      Defendants' actions have critically undermined the triad of patient care: the pharmacy-patient-prescriber relationship. States have enacted laws and regulations to govern the practice of pharmacy and medicine to ensure that these sectors are free of inappropriate corporate interference and can prioritize patient care and safety above all. States have also established trade laws to protect consumers from unfair and deceptive practices, especially those that could affect their health. Rather than following these laws, Defendants' scheme has chipped away and hollowed out these protections.

4.      Alongside state-level protections for patients, this nation's pharmaceuticals are governed and protected by an approval process that ensures the safety, effectiveness, and quality of medicines before they reach patients. This process gives the American public confidence in the medicines that millions take every day. Companies like Novo Nordisk use this process and diligently follow its myriad of requirements for approval.

5.      Along these lines, Novo Nordisk's innovative molecule, semaglutide, is the active ingredient in three of its blockbuster medicines, marketed under the well-known trade names Ozempic®, Wegovy®, and Rybelsus®. The U.S. Food and Drug Administration ("FDA") reviewed Novo Nordisk's clinical trials and testing before determining that all three of these drugs are safe and effective. Novo Nordisk manufactures the only semaglutide active pharmaceutical ingredient ("API") that has been reviewed by FDA and is included in an FDA-approved medicine.

6.      FDA is clear that patients should receive FDA-approved treatments whenever possible because patients could be injured, hospitalized, or even die from taking compounded drugs such as the drugs marketed by the Defendants that purport to contain semaglutide. Because FDA does not review

the safety, effectiveness, or quality of these drugs before they are marketed, these drugs may be contaminated or contain too much or too little of the key active ingredient.

7.     Given these safety concerns, most states developed laws prohibiting the sale or distribution of unapproved drugs to patients.

8.     Although for patients whose medical needs cannot met by an FDA-approved drug, compounding[1] may be appropriate, FDA has always intended compounding as a narrow exception to its drug approval process.

9.     State and federal law place conditions on compounded drugs for them to qualify for this narrow exception to guard against entities compounding drugs acting as unlicensed, unregulated drug manufacturers selling drugs that could be dangerous to patients.

10.     By exploiting the narrow compounding exception in a way that subverts the drug approval process and undermines patient safety, Defendants have made these dangers a reality.

11.     The shortage of Novo Nordisk's semaglutide injection products ended February 21, 2025, although FDA provided a 90-day window to allow outsourcing facilities to "facilitate an orderly transition" from their compounded drugs to FDA-approved semaglutide medicines.[2]

12.     Recognizing that their ability to compound "copies" of Novo Nordisk's semaglutide medicines would soon close, Defendants claimed to shift their focus to providing "personalized" versions of the compounded drug products that purport to contain semaglutide or tirzepatide, but that have not been approved by FDA ("Unapproved Compounded Drugs") under a different federal exemption.

---

[1] Compounding is a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. *See* FDA, *Human Drug Compounding* (content current as of May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[2] Letter from Jacqueline Corrigan-Curay (Acting Director, Center for Drug Evaluation and Research, FDA) to Robert Fischer (Director, Regulatory Affairs, Novo Nordisk Inc.) (Feb. 21, 2025), https://www.fda.gov/media/185526/download.

13.     Non-physician Fella executives have regularly interfered with, and controlled, physician's prescribing decisions by orchestrating a scheme in which the drugs marketed by Defendants are in no meaningful way "tailored" to the particular medical needs of any of the tens of thousands of patients to whom Fella has been selling these medicines.

14.     Rather, Fella has fabricated a pre-set selection of dosages created to be just different enough from the FDA-approved doses of semaglutide to carry out this scheme. Moreover, it has continued to offer these Unapproved Compounded Drugs to thousands of different patients without modification. In doing so, Fella directs patients away from safe and effective FDA-approved medications and toward clinically untested, unapproved, and potentially unsafe drugs.

15.     Defendants built their compounded semaglutide business by deceiving patients with false and misleading advertisements, selling an unapproved and misbranded drug under state law, exerting so much inappropriate control over physicians' prescribing practices that Defendants are, in essence, practicing medicine, and leveraging these violations to engage in unfair and deceptive trade practices. Defendants then fraudulently sold hundreds of thousands of Unapproved Compounded Drugs, knowing that these drugs violate state law and could put patients at risk.

16.     Defendants' scheme has flooded the market with unlawfully produced drugs and created a demand for these drugs.

17.     Defendants' actions could lead to devastating consequences. A former FDA commissioner observed that compounding of semaglutide is a "reckless national experiment," and healthcare providers have warned that such compounding is "the largest uncontrolled, unconsented human experiment of our time."[3] The Federal Bureau of Investigation ("FBI") has indicated that "[t]esting of the compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and had large percentages of unknown drug impurities."[4]

---

[3] *See* The Obesity Society, *FDA-Approved vs. Compounded GLP-1s: Comparing Safety, Quality, and Transparency*, https://www.youtube.com/watch?v=BJ5DU6u6rZI (Mar. 24, 2025).

[4] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

18.     It is clear that Defendants do not intend to end their unlawful enterprise. To the contrary, they have doubled-down on pushing as many Unapproved Compounded Drugs to patients as possible.

19.     Defendants' scheme threatens to turn the drug approval process into a sham. Left to continue their unlawful activities, Defendants' organization would serve as a blueprint for mass production of compounded versions of medicines even if those drugs are not medically necessary for patients. It will also embolden other businesses to adopt similar models, in which corporate interests control the practice of medicine and place profits over patient safety.

20.     Novo Nordisk seeks declaratory, injunctive, and monetary relief, including a declaration that Defendants have engaged in unlawful conduct in connection with the manufacture and sale of compounded semaglutide products, an injunction against such conduct, and disgorgement of their illegal profits.

## THE PARTIES

21.     Plaintiff Novo Nordisk A/S ("NNAS") is a corporation organized and existing under the laws of the Kingdom of Denmark and has its principal place of business in Bagsværd, Denmark.

22.     NNAS developed the Ozempic®, Wegovy®, and Rybelsus® medicines and has granted to Novo Nordisk Inc. ("NNI") exclusive rights to market, advertise, promote, offer for sale, and sell those medicines in the United States.

23.     Plaintiff NNI is an indirect, wholly-owned subsidiary of NNAS, organized and existing under the laws of Delaware with a principal place of business in Plainsboro, New Jersey.

24.     NNI promotes, offers, and sells the Ozempic®, Wegovy®, and Rybelsus® medicines throughout the United States, including in this District.

25.     Defendant Aios Inc. (d/b/a Fella Health and Delilah) is a Delaware corporation with a principal place of business at 2261 Market Street #4540, San Francisco, CA 94114. Fella Health and Delilah are telehealth platforms that provide weight loss treatments. Fella Health is marketed towards men, and Delilah is marketed towards women. Both companies operate and conduct business in California, including by promoting and selling Unapproved Compounded Drugs within the State.

26.     Fella Medical Group P.A. is a Florida professional association with its principal place of business at the same location as Fella, 2261 Market Street #4540, San Francisco, CA 94114.

27.     Fella Medical Group P.C. is a California professional corporation with its principal place of business at the same location as Fella, 2261 Market Street #4540, San Francisco, CA 94114.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over the Lanham Act cause of action pleaded herein pursuant to 15 U.S.C. § 1121, and 28 U.S.C. § 1331. Additionally, and in the alternative, the Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

29.     The Court has supplemental jurisdiction over the state causes of action pleaded herein pursuant to 28 U.S.C. § 1367(a), as it is part of the same case or controversy as the federal claim.

30.     Defendant Fella Health is subject to personal jurisdiction in California because its principal place of business is in California.

31.     The Fella Medical Group Defendants are subject to personal jurisdiction in California because their principal places of business are in California.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial amount of the harms alleged took place in this District.

## DIVISIONAL ASSIGNMENT

33.     Pursuant to Civil L.R. 3-2(c), this case arises in the County of San Francisco, as a substantial part of the events or omissions giving rise to the claims occurred in the County of San Francisco. For example, Defendant Fella Health, most notably, lists its principal place of business in the County of San Francisco.

## FACTS ENTITLING NOVO NORDISK TO RELIEF

**A.    Novo Nordisk**

34.     Novo Nordisk is a healthcare company with a 100-year history of innovation in developing medicines to treat serious chronic diseases like diabetes and obesity.

35.    For more than a century, Novo Nordisk has been on the cutting edge of developing life-saving medicines. The company's roots can be traced to the early commercialization of the production of insulin in 1923. Today, Novo Nordisk's medicines provide relief for tens of millions throughout the world.

36.    Like other reputable pharmaceutical manufacturers that produce medicines at scale, Novo Nordisk produces its medicines in accordance with FDA requirements and under strict controls in its state-of-the-art facilities. Novo Nordisk employs thousands of professionals who have the necessary expertise to adhere to these quality and safety standards.

37.    Producing medicines in this way is a complex, science-based, and rigorous process. Novo Nordisk follows Current Good Manufacturing Practices ("cGMP"), the industry standards that help to ensure quality and safety throughout the design, monitoring, and control of its products across manufacturing processes and facilities. Such practices mean that Novo Nordisk, for example, has processes in place to detect and investigate product quality issues and to ensure the quality of its source materials when procuring its products.

38.    In addition, Novo Nordisk is required to comply with all applicable laws under the Federal Food, Drug, and Cosmetic Act ("FDCA") and manufactures its medicines under strict FDA oversight. By doing so, Novo Nordisk offers patients peace of mind that they are using medicines that meet the world's most rigorous quality and safety standards. Novo Nordisk's medicines are subject to exacting pre-approval testing for safety and efficacy under specific conditions for use; its manufacturing facilities are subject to routine FDA inspections; and the company conducts post-market surveillance and studies.

39.    Novo Nordisk's medicines also must be and always are accompanied by labels, instructions, and warnings, which themselves are approved by FDA. Novo Nordisk's medicines are FDA-approved as safe, effective, and of high quality.

B.    **Novo Nordisk's Semaglutide Products**

40.    The development of semaglutide is an example of Novo Nordisk's commitment to innovation for those living with chronic diseases. Semaglutide is the foundational molecule that serves

6

as the primary ingredient for Novo Nordisk's three prescription-only medicines approved by FDA: Wegovy® (semaglutide) injection, Ozempic® (semaglutide) injection, and Rybelsus® (semaglutide) tablets.

41.     The Wegovy® medicine is indicated to reduce excess body weight and maintain weight reduction long-term in adults and children aged 12 years and older with obesity, and adults that are overweight with weight-related medical problems, along with a reduced calorie diet and increased physical activity. Wegovy® is also indicated, with a reduced calorie diet and increased physical activity, to reduce the risk of adverse cardiovascular events such as cardiovascular death, heart attack, or stroke in adults with known heart disease who are either obese or overweight.

42.     The Ozempic® medicine and the Rybelsus® medicine are indicated for adults with type 2 diabetes to improve blood sugar (glucose), along with diet and exercise. The Ozempic® medicine also lowers the risk of cardiovascular events such as stroke, heart attack or death in adults with type 2 diabetes and heart disease and reduces the risk of sustained estimated glomerular filtration rate ("eGFR") decline, end-stage kidney disease, and cardiovascular death in adults with type 2 diabetes and chronic kidney disease.

43.     Each of the Wegovy®, Ozempic®, and Rybelsus® medicines has a unique safety and efficacy profile which is set forth in its respective product label.

44.     The Wegovy®, Ozempic®, and Rybelsus® medicines are prescription-only medicines that should be prescribed only in direct consultation with, and under the supervision of, a licensed healthcare professional.

45.     The Wegovy®, Ozempic®, and Rybelsus® medicines have been extensively studied in clinical trials and are FDA-approved for the treatment of patients with serious chronic diseases.

46.     Novo Nordisk is the only company in the U.S. authorized to sell FDA-approved products containing semaglutide.

47.     FDA has not approved any generic versions of semaglutide medicines. To the contrary, FDA has sent warning letters to companies that have claimed that their unapproved products have the "same active ingredient as Ozempic®, Rybelsus®, and Wegovy®," noting that the Ozempic® and

Wegovy® medicines are the only "two injectable semaglutide products FDA-approved for the U.S. market."[5]

48.    Novo Nordisk does not sell its semaglutide API to Defendants, compounding pharmacies, or outsourcing facilities for the purpose of compounding semaglutide products.

49.    Defendants market and sell to patients what this Complaint refers to as "Unapproved Compounded Drugs," *i.e.*, those produced and sold by the Defendants that they claim contains semaglutide but have not been approved by FDA.

**C.    The FDA Drug Approval Process**

50.    FDA's drug approval process serves as the foundation of U.S. drug regulation. FDA's drug review process is recognized as the gold standard worldwide. New drugs in the U.S. must undergo a rigorous evaluation of safety, quality, and effectiveness before they can be sold.

51.    Testing new drugs and obtaining the required regulatory approval to sell them is time-consuming and costly ("[o]n average, it takes 10–15 years and costs $2.6 billion to develop one new medicine"[6]), but drug approval is essential to ensure the quality, safety, and effectiveness of new drugs, and approval is based on evidence.

52.    FDA approval is famously hard to earn. More than 90 percent of drug candidates ultimately fail.[7]

53.    Drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological activity that justifies commercial development. Based on data derived from preclinical testing, FDA

---

[5] FDA, *Warning Letter to Ozempen.com, MARCS-CMS 684435 — JUNE 24, 2024*, (last updated July 2, 2024) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/ozempencom-684435-06242024#:~:text=WARNING%20LETTER&text=As%20discussed%20below%2C%20FDA%20has,new%20drugs%20and%20misbranded%20dru.

[6] PhRMA, *Research and Development Policy Framework* (last updated Sept. 2024), https://phrma.org/policy-issues/research-development.

[7] Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf (hereinafter "BIO 2021").

permits the drug sponsor to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

54.     Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing. This determination typically culls a majority of drug candidates—for example, averaging across diseases, only 52 percent of drug candidates that make it through Phase I testing will progress to Phase II.[8]

55.     Phase II trials are typically designed to establish preliminarily the effectiveness in addition to further confirming safety of the drug for an indication over a range of doses and to develop additional data on its safety. Another swath of drug candidates is eliminated in Phase II: drug candidates progress from Phase II to Phase III at rates between 15 and 48.1 percent depending on disease type.[9] Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a larger patient population as well as to monitor side effects.

56.     Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application, where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States. The sponsor must identify every ingredient and component in its application to FDA.

57.     Once a drug is approved for manufacture and distribution, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications. FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.

**D.     Compounded Drugs**

58.     Compounding is historically a practice in which a licensed pharmacist or physician combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an

---

[8] BIO 2021 at 7.

[9] *Id.*

individual patient.[10] According to FDA, "compounded drugs are not FDA-approved," and "do not undergo FDA's review for safety, effectiveness and quality before they are marketed."[11]

59.    FDA has warned that "[u]nnecessary use of compounded drugs unnecessarily exposes patients to potentially serious health risks" and that "poor compounding practices can result in serious drug quality problems, such as contamination or a drug that contains too much or too little active ingredient . . . [which] can lead to serious patient injury and death."[12]

60.    Consistent with this warning, FDA recommends that compounded drugs "should only be used for patients whose medical needs cannot be met by an available FDA-approved drug."[13]

**E.    Government Warnings of Risks of Compounded Semaglutide**

61.    Regulatory agencies in the United States and throughout the world have warned the public that taking unapproved compounded products that claim to contain semaglutide can endanger patients. FDA has publicly warned that compounded glucagon-like peptide-1 ("GLP-1") receptor agonists "can be risky for patients."[14]

62.    FDA also released a compounding risk alert to health care providers, compounders, and patients about dosing errors associated with compounded injectable semaglutide products.[15]

---

[10] *See* FDA, Human Drug Compounding, https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding

[11] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[12] FDA, *Compounding and the FDA: Questions and Answers* (last updated Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[13] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[14] *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

[15] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), (continued…)

10

63.     FDA has also sent a letter to the Alliance for Pharmacy Compounding, the Federation of State Medical Boards, the National Association of Boards of Pharmacy, the National Council of State Boards of Nursing and the Outsourcing Facility Association highlighting additional factors that contribute to the adverse events associated with compounded drugs claiming to contain semaglutide, including starting patients on incorrect doses, changing the dose administration frequency or titrating on a schedule that deviates from that of Novo Nordisk's FDA-approved semaglutide medicines.[16]

64.     Federal lawmakers have also warned the public about "a surge in illegal and counterfeit anti-obesity medications…which include semaglutide…entering the U.S. from unregistered foreign entities."[17] On July 25, 2025, U.S. Representative Richard Hudson sent FDA Commissioner Marty Makary a letter inquiring about the agency's efforts to curb the spread of these Unapproved Compounded Drugs, noting that such products "may contain dangerously high concentrations of active ingredients, unknown compounds, or contaminants."[18] Therefore, "these substances pose a significant threat to consumer health, including the potential for adverse reactions, toxic exposure, or overdose."[19] Congressman Hudson's letter was signed by a bipartisan group of 80 members of the U.S. Congress.

65.     The FBI has also issued a public service announcement warning about the risks of compounded products claiming to contain semaglutide. The FBI indicated that "[t]esting of the compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and

---

https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[16] Letter from Shannon Glueck, Branch Chief, Compounding Branch 4, U.S. Food and Drug Administration to Philip Dickison, Chief Executive Officer, National Council of State Boards of Nursing (Jul. 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

[17] U.S. Representative Richard Hudson, *Letter to FDA Commissioner Marty Makary on Illegal and Counterfiet Anti-Obesity Medications*, (July 25, 2025) https://x.com/RepRichHudson/status/1948775451960193226/photo/1.

[18] *Id*.

[19] *Id*.

had large percentages of unknown drug impurities."[20] The FBI highlighted that providers are using compounded mixtures of unknown drugs that "do not contain semaglutide, drugs with high levels of impurities, and unsafe or unapproved drugs."[21] One southern-based medical spa and weight loss clinic reportedly offered and sold their own compounded "semaglutide" product, which used "'animal grade' semaglutide with vitamin B12."[22]

66.    At least 18 state boards of pharmacy, boards of medicine, and other state professional regulators have alerted licensees in their states about compounded products that claim to contain semaglutide.[23] For instance, the Alabama Board of Medical Examiners has cautioned that semaglutide products other than those manufactured by Novo Nordisk "may be contaminated, improperly stored and transported, or adulterated."[24]

---

[20] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

[21] *Id.*

[22] *Id.*

[23] *See, e.g.*, Ala. Bd. Pharmacy, Compounding Semaglutide (Nov. 2023); Ala. State Bd. of Medical Examiners, Declaratory Ruling of the Alabama State Board of Medical Examiners (Aug. 8, 2024); Health Professions Bureau of the Idaho Div. of Occupational and Prof'l. Licenses, Clinic Dispensing of GLP-1 Products (May 24, 2024); Ill. Dep't. of Fin. and Prof'l. Regul., Consumer Alert: Compounded Weight Loss Drugs (Summer 2024); Kan. Bd. Pharmacy, Statement on Compounding and Dispensing of Compounded Semaglutide and Other GLP-1 Receptor Agonists (Apr. 16, 2025); Ky. Bd. Pharmacy, Semaglutide Compounding Guidance (2025); Meg Farris, Low-cost weight loss drug banned in La., 4WWL (Apr. 27, 2023) (reflecting ban by Louisiana Board of Pharmacy); Minn. Bd. Pharmacy, Semaglutide and GLP-1 Drugs (Jul. 2024); Miss. Bd. Pharmacy, Compounded Products Due to Shortage or Due to Special Patient Needs; Miss. State Bd. of Medical Licensure, Guidance Regarding Semaglutide-Based Medications From the Mississippi State Board of Medical Licensure (Aug. 29, 2023); N.C. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 2023); N.J. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Nov. 6, 2023); Ohio Bd. Pharmacy, FDA Alerts Health Care Providers, Compounders, and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products (Aug. 2024); Or. Bd. Pharmacy, Statement on Semaglutide (Feb. 6, 2025); S.D. Bd. Pharmacy, Beware of Fraud and Counterfeit Popular Weight Loss Products (Jan. 2024); Utah Bd. Pharmacy, Compounded Semaglutide – Cautions and Concerns (May 2024); Wash. State Department of Health, Statement on Compounding Semaglutide (Aug. 22, 2024); W. Va. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 2023).

[24] Ala. Bd. Med. Exam'rs & Med. Licensure Comm'n, *Concerns with Semaglutide and Other GLP-1 Receptor Agonists*, https://www.albme.gov/press-release/concerns-with-semaglutide-and-other-glp-1-receptor-agonists.

67.    On February 19, 2025, a coalition of 38 state attorneys general urged FDA to take decisive action against "bad actors unlawfully profiting off the high demand for FDA-approved weight loss and diabetes drugs."[25] The letter sent by the Attorneys General encouraged FDA to "ramp up enforcement against any compounding pharmacies" due to the serious adverse events associated with contaminated drug products produced by compounding pharmacies under insanitary conditions.[26]

68.    Six state attorneys general also released separate alerts warning patients in their states about compounded drugs claiming to contain semaglutide.[27] For example, the Illinois Attorney General alerted consumers that sellers advertising "name brand medications [such as Ozempic® and Wegovy®] are instead offering unapproved versions of these products that may put people's health at risk."[28] The attorney general further warned consumers about misleading advertising that claims to offer name brand GLP-1 medications when the seller is actually selling compounded drugs, which the attorney general affirms "are not the same as generic drugs."[29]

---

[25] Letter from The National Association of Attorneys General to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Feb. 19, 2025), https://www.naag.org/wp-content/uploads/2025/02/FDA-GLP-1-Ltrhead-e.pdf.

[26] Id.

[27] Office of the Illinois Attorney General Kwame Raoul, Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss (updated Jan. 3, 2025); Office of South Carolina Attorney General Alan Wilson, CONSUMER ALERT: Attorney General Alan Wilson warns consumers to be cautious when purchasing unapproved and compounded weight loss medications (Jan. 3, 2025); Office of Ohio Attorney General Dave Yost, AG Yost Warns Med Spas: Stop Misleading Consumers About Weight-Loss Drugs (Apr. 16, 2025); Office of Tennessee Attorney General Jonathan Skrmetti, Tennessee Attorney General's Consumer Protection Division Warns Consumers of Counterfeit Weight Loss Drugs (Mar. 20, 2025); Office of Mississippi Attorney General Lynn Fitch, AG Fitch Warns Mississippians of Unapproved and Compounded Weight Loss Medication (May 6, 2025); Office of the Connecticut Attorney General William Tong, Attorney General Tong Sues GLP-1 Weight Loss Drug Distributor Triggered Brand, Announces Investigation Into Made In China Over Sale of Untested, Unsafe "Research-Grade" Drugs to Connecticut Consumers (May 21, 2025).

[28] Office of the Illinois Attorney General Kwame Raoul, Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss (last updated Jan. 3, 2025), https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss.

[29] Id.

**F.**     **Other Warnings About the Risks of Compounded Semaglutide**

69.     Patient and provider groups have also spoken out about the risks associated with compounded products claiming to contain semaglutide.[30] On December 2, 2024, the American Diabetes Association ("ADA") released a statement on compounded GLP-1 and dual glucose-dependent insulinotropic polypeptide ("GIP") and GLP-1 receptor agonists. The ADA "recommends against using non-FDA-approved compounded GLP-1 and dual GIP/GLP-1 RA products due to safety, quality, and effectiveness concerns and uncertainty about their content."[31]

70.     International regulators too have recognized the serious risks associated with compounded drugs claiming to contain semaglutide.

71.     In early 2025, Health Canada issued a recall notice for compounded "semaglutide" and pyridoxine drugs from an Alberta-based compounding pharmacy, highlighting that the products were "produced with an unauthorized active pharmaceutical ingredient."[32] On March 5, 2025, the South

---

[30] *See, e.g.*, The Obesity Society, Obesity Action Coalition, & Obesity Medicine Association, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024); Endocrine Society, *Webinar will examine concerns around compounding anti-obesity medications* (Nov. 6, 2024); National Academies of the Sciences, Engineering, and Medicine, *New Weight Loss Drugs (GLP-1s) Explained: Science, Impact, Potential* (Nov. 21, 2024); Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024); Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181 (Feb. 2025); Letter from Aimed Alliance, Alliance for Women's Health & Prevention, Association of Black Cardiologists, Bone Health & Osteoporosis Foundation, Chronic Care Policy Alliance, Color of Gastrointestinal Illnesses, Diabetes Patient Advocacy Coalition, Global Liver Institute, HealthyWomen, Mended Hearts, Minority Health Institute, National Alliance for Caregiving, National Black Nurses Association, National Consumer League, National Hispanic Health Foundation, National Hispanic Medical Association, Obesity Action Coalition, The Obesity Society, WomenHeart, Lyn Behnke, Lisa Larkin, and Spencer Nadolsky to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Mar. 20, 2025).

[31] Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181 (Feb. 2025), https://diabetesjournals.org/care/article/48/2/177/157478/Compounded-GLP-1-and-Dual-GIP-GLP-1-Receptor.

[32] Health Canada, *Health Product Recall: Semaglutide + Pyridoxine: produced with an unauthorized active pharmaceutical ingredient* (last updated Jan. 21, 2025), https://recalls-rappels.canada.ca/en/alert-recall/semaglutide-pyridoxine-produced-unauthorized-active-pharmaceutical-ingredient.

African Health Products Regulatory Authority ("SAHPRA") announced its intent to declare

compounded drugs containing GLP-1 agonists "undesirable," and therefore unable to be sold, under

South Africa's Medicines and Related Substances Act.[33] According to the Act, SAHPRA may declare a

medicine "undesirable" if it is not in the public interest that such medicine is made available to the

public.[34] SAHPRA concluded that compounded products using GLP-1 agonist active ingredients are not

in the public interest because of the inherent variability, lack of regulatory oversight, and potential safety

risks associated with such practices.[35]

72.     Furthermore, the Brazilian Health Regulatory Agency ("ANVISA") concluded that the

safety and efficacy profile of the synthetic semaglutide being used in compounding may be different

from semaglutide manufactured using recombinant DNA technology and that these differences could

result in impurities with a higher degree of toxicity, which could decrease the safety of the final

product.[36] ANVISA has also stated that, regardless of its source, semaglutide presents technical

challenges that compounding pharmacies are often not equipped to overcome.[37]

73.     The Australian government took the largest step to protect patients and banned

compounding pharmacies in Australia from making GLP-1s like semaglutide based on safety

concerns.[38]

---

[33] South African Health Products Regulatory Authority, *Communication to Stakeholders: INTENTION TO DECLARE MEDICINES COMPOUNDED IN TERMS OF SECTION 14(4) CONTAINING GLP-1 OR GLP-1/GIP AGONISTS UNDESIRABLE IN TERMS OF SECTION 23 OF THE MEDICINES AND RELATED SUBSTANCES ACT, ACT 101 OF 1965, AS AMENDED* (Mar. 5, 2025), https://www.sahpra.org.za/wp-content/uploads/2025/03/Comms-to-Industry-RC03-Intention-to-Declare-Medicines-Compounded.pdf.

[34] *Id.*

[35] *Id.*

[36] *See* Agencia Nacional de Vigilancia Sanitaria (ANVISA), Nota Técnica No. 74/2024/SEI/COINS/GGFIS/DIRE4/ANVISA (Sept. 18, 2024); ANVISA, Nota Técnica No. 92/2024/SEI/COINS/GIMED/GGFIS/DIRE4/ANVISA (Nov. 13, 2024).

[37] ANVISA, Nota Técnica No. 115/2025/SEI/GIMED/GGFIS/DIR4/ANVISA (Mar. 21, 2025).

[38] Therapeutic Goods Act 1990 (effective date Oct. 1, 2024), https://www.legislation.gov.au/F1996B00406/latest/text; Ministers Department of Health and Aged (continued…)

**G.      Safety Risks of Unapproved Compounded Drugs**

74.      The danger of compounded semaglutide is not merely theoretical, as the manufacture and distribution of improperly formulated compounded drugs have endangered and harmed public health. There is a long history of illnesses and deaths associated with erroneously compounded drugs distributed to patients, including in California.[39]

75.      One of the most significant outbreaks was the New England Compounding Center crisis. In 2012, nearly 800 patients in 20 states were diagnosed with a fungal meningitis infection after receiving injections of an unapproved preservative-free methylprednisolone acetate drug manufactured in Massachusetts.[40] At least one hundred people died as a result of the outbreak.[41] As FDA has stated, the outbreak "was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs," and "many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then."[42]

76.      Additionally, there have been notable public health incidents involving compounded drugs affecting California patients or originating from California compounding pharmacies. One significant example occurred in 2017, where a compounding pharmacy in Irvine compounded curcumin (a component of the spice turmeric) emulsion products for injection that contained polyethylene glycol

---

Care, *Protecting Australians from Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products?language=en.

[39] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated with Compounded or Repackaged Medications 2001-19* (Mar. 2, 2020), https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

[40] DOJ, *Two Former New England Compounding Center Pharmacist Sentenced* (May 30, 2019), https://www.justice.gov/usao-ma/pr/two-former-new-england-compounding-center-pharmacists-sentenced.

[41] *Id.*

[42] FDA, *FDA's Human Drug Compounding Progress Report* (Jan. 2017), https://www.fda.gov/media/102493/download.

("PEG") 40 castor oil, which is typically used industrially or for research but is not suitable to treat humans.[43] One patient who received this product suffered from a heart attack, lost oxygen to the brain, and died.[44] In 2014, a California clinic injected a patient with an unknown compounded mixture to treat chronic musculoskeletal pain; the patient later learned that she had contracted Hepatitis C virus when she attempted to donate blood.[45] A subsequent investigation by local public health agencies and the U.S. Centers for Disease Control and Prevention discovered that the patient and six others contracted Hepatitis C virus after receiving injections at the same California clinic. The investigation uncovered poor infection control practices at the clinic, including reentering a multidose vial with a used syringe, using a single-dose vial for multiple patients, poor hand hygiene, and inconsistent glove use.[46]

77.    Because of the risk inherent in compounded drugs, FDA has issued several other "compounding risk alerts to inform health care professionals and compounders about risks associated with compounded drugs, including information on adverse events, outbreaks and issues with product quality."[47] These alerts have warned about compounded drugs that did not contain the active ingredient

---

[43] *See* FDA, *FDA investigates two serious adverse events associated with ImprimisRx's compounded curcumin emulsion product for injection* (Aug. 4, 2017), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-serious-adverse-events-associated-imprimisrxs-compounded-curcumin-emulsion; Janet Woodcock and Julie Dohm, *Toward Better-Quality Compounded Drugs — An Update from the FDA*, 377 New England J. of Med. 2509 (Dec. 2017), https://www.nejm.org/doi/full/10.1056/NEJMp1712905.

[44] *Id.*

[45] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19*, (Mar. 2, 2020) https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

[46] *See* Monique A. Foster et al., *Notes from the Field: Investigation of Hepatitis C Virus Transmission Associated with Injection Therapy for Chronic Pain — California, 2015*, 65 CDC Morbidity and Mortality Weekly Report 547 (Jun. 2016).

[47] FDA, *Compounding Risk Alerts* (last updated Apr. 22, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-risk-alerts.

17

listed on the label of the product[48] and the variability in dosages of the active ingredients in compounded drug products intended for oral and sublingual administration.[49] FDA has stated that these issues make it "challenging to predict which potential risks may be associated with these products," and place patients "at risk for serious adverse events, misuse, and abuse."[50]

78.    FDA and California regulatory authorities have also worked together to protect patients from quality issues related to compounded semaglutide products.

79.    On April 6, 2022, the California Board of Pharmacy notified the public that an out-of-state compounding pharmacy was expanding its recall of products due to a lack of assurance of sterility.[51] This recall included batches of compounded semaglutide products. The compounding pharmacy ultimately recalled over 15,000 vials of compounded semaglutide across the country.[52]

80.    On August 14, 2024, FDA received a complaint from a patient who noticed a black particulate in a vial of semaglutide compounded by a pharmacy in Ontario, California.[53] FDA and California regulatory authorities inspected the facility a month later and discovered conditions that could cause the compounded drugs to become contaminated.[54]

---

[48] FDA, *FDA investigates two adverse events associated with United Pharmacy's compounded glutamine, arginine, and carnitine product for injection* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-adverse-events-associated-united-pharmacys-compounded-glutamine-arginine-and.

[49] FDA, *FDA warns patients and health care providers about potential risks associated with compounded ketamine products, including oral formulations, for the treatment of psychiatric disorders* (last updated Oct. 10, 2023), https://www.fda.gov/drugs/human-drug-compounding/fda-warns-patients-and-health-care-providers-about-potential-risks-associated-compounded-ketamine.

[50] *Id.*

[51] California Board of Pharmacy, Recall Alert: Tailor Made Compounding (Apr. 4, 2022), https://www.pharmacy.ca.gov/about/recall_alerts/040622_taylor.pdf.

[52] *See* FDA Enforcement Report, Event ID 89909 (2022), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Event=89909.

[53] *See* FDA, ☐ *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness*, (last updated Nov. 1, 2024) https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness.

[54] *Id.*

18

**H.    Adverse Events Reported After Taking Compounded Semaglutide Drugs**

81.    FDA has reported that it has "received multiple reports of adverse events, some requiring hospitalization, that may be related to" compounded drugs purporting to contain semaglutide and has reminded patients and health care professionals that the "agency does not review compounded versions of these drugs for safety, effectiveness, or quality."[55]

82.    According to FDA's Adverse Event Reporting System, as of March 31, 2025, there had been 767 cases of adverse events associated with compounded products that purport to contain semaglutide.[56] This figure is triple the number of adverse events for *all* compounded drugs in fiscal year 2022.[57] FDA has classified approximately 75 percent of those cases as "serious" adverse events; approximately 25 percent of those cases have resulted in hospitalization; and 14 of those cases involved patient deaths.[58]

83.    Such adverse events are likely underreported.[59] These adverse events are underreported because unlike manufacturers of FDA-approved medicines, federal law does not require state-licensed

---

[55] FDA, *Medications Containing Semaglutide Marketed for Type 2 Diabetes or Weight Loss* (last updated Jan. 10, 2024), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

[56] FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[57] FDA, *Mitigating Risks of Compounded Drugs Through Surveillance* (current as of Sept. 20, 2023), https://www.fda.gov/drugs/human-drug-compounding/mitigating-risks-compounded-drugs-through-surveillance.

[58] FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[59] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated Dec. 18, 2024), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

pharmacies to report adverse events to FDA[60] and outsourcing facilities report only adverse events that they classify as serious and unexpected.[61]

## I.    Governing State and Federal Law

### 1.    The Lanham Act

84.    The Lanham Act protects consumers and competitors from deception and unfair competition in the marketplace. It does so in part by prohibiting false and misleading statements of fact in commercial advertising and promotion. Statements that misrepresent the nature, characteristics, or qualities of a business's goods, services, or commercial activities are actionable under Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

### 2.    California False Advertising Law

85.    California's False Advertising Law makes it unlawful for any person or entity to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

### 3.    California Unfair Competition Law

86.    California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

87.    The "unlawful" prong of California's Unfair Competition Law establishes a cause of action for unfair competition based on violations of other state laws.

88.    The "fraudulent" prong of California's Unfair Competition Law establishes a cause of action for false or misleading statements of fact in commercial advertising or promotion.

---

[60] *Id.*

[61] *See* FDA, *Guidance for Industry: Adverse Event Reporting for Outsourcing Facilities Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (Oct. 2015), https://www.fda.gov/media/90997/download.

### 4.    California Law Governing Corporate Practice of Medicine

89.    California, like a majority of states, prohibits corporations from practicing medicine[62]—a legal bar known as the corporate practice of medicine doctrine.

90.    This longstanding doctrine bans corporations not only from directly practicing medicine, as its name implies, but also from employing physicians to provide professional medical services or controlling or influencing the practice of medicine.

91.    The public policy concerns animating the corporate practice of medicine doctrine are stark: There exists a clear tension between a corporation's obligation to its shareholders to maximize profits and a physician's duty to provide quality care to patients. This tension, if not mitigated with appropriate controls, would inevitably compromise a physician's independent medical judgment, risking harm to patient health.

92.    Under California's corporate practice of medicine doctrine, "a corporation may not engage in the practice of medicine, either directly or indirectly, by contracting with physicians or other health care professionals to provide health care services."[63] At its core, this law is intended to prevent unlicensed persons from interfering with, or influencing, the physician's professional judgment."[64]

93.    The Medical Board of California ("Board") has made clear that violation of the state's corporate practice of medicine law does not necessarily depend on existence of a formal employment relationship, noting that a corporation may engage in unlawful corporate practice of medicine "even if physicians operate as independent contractors and not as employees of [the] corporation."[65]

---

[62] *See* Cal. Bus. & Prof. Code §§ 2052 (criminalizing the practice of medicine without a license), 2032 (permitting only natural persons to be licensed to practice medicine in California), 2400 (providing that "[c]orporations and other artificial entities . . . have no professional rights, privileges, or powers" in the practice of medicine in California).

[63] Medical Board of California, Enforcement Actions Re Unlicensed Practice of Medicine (May 5, 2011) ("MBC CPOM Enforcement Guidance").

[64] *See* Medical Board of California, Information Pertaining to the Practice of Medicine: Corporate Practice of Medicine, https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/ ("MBC CPOM Guidance").

[65] MBC CPOM Enforcement Guidance.

94.     Rather, the relevant inquiry turns on the extent of influence exerted by a corporation over physicians. As the Board has explained, a corporation violates California law "when it exercises control over decisions made by" physicians.[66]

95.     The Board has outlined the kinds of decisions that must remain strictly within the purview of licensed physicians:

- Identifying diagnostic tests appropriate for a condition;

- Determining the need for referrals to or consultation with another physician;

- Taking responsibility for the ultimate overall care of the patient (*including treatment options*); and

- Deciding the number of patients a physician sees in a given period of time or how many hours a physician works.[67]

96.     Corporations engaging in any such activities run afoul of California's prohibition on the corporate practice of medicine.

97.     California corporate practice of medicine law "encompass[es] not only direct medical decisions, but 'business' and 'administrative' decisions which have medical implications as well."[68] To this end, the Board has identified "business" or "management" decisions and activities that amount to control over a physician's practice of medicine and that, if exercised by a corporation, would raise "red flags" indicating the corporate practice of medicine. These responsibilities include, *inter alia*, owning a patient's medical records and selecting, hiring, and firing physicians.[69]

98.     California law governing telehealth likewise makes clear that a corporation cannot be involved in clinical decisions regarding prescriptions—including a prescription drug's formulation, dosage, or titration schedule. Rather, such prescribing decisions must be made by a physician pursuant

---

[66] MBC CPOM Enforcement Guidance.

[67] *See* MBC CPOM Guidance (emphasis added).

[68] MBC CPOM Enforcement Guidance.

[69] *See* MBC CPOM Guidance.

to a good faith assessment of the patient, which should identify the clinical need for the drug prescribed.[70]

99.    Due to California's corporate practice of medicine doctrine, telehealth companies owned and operated by non-physicians are prohibited from providing medical care to patients or employing physicians to provide such care.

100.    To comply with this restriction, telehealth companies often rely on an exception to the corporate practice of medicine granted by law to physicians—known as a "professional corporation" ("PC") or sometimes in other states, a "professional association" ("PA"). Subject to limited exceptions, non-physicians cannot own shares in or exercise control over a PC.[71] To protect physician autonomy, California prohibits shareholders of a PC from entering into a voting "arrangement vesting another person (other than another person who is a shareholder of the same [PC]) with the authority to exercise the voting power of any or all of the shareholder's shares."[72]

101.    Although a corporate telehealth company may contract with one or more PCs—either directly or through a management services organization—this partnership cannot stray beyond limited administrative support. The Board has recognized that partnerships between corporations and PCs would violate California law to the extent that they involve a "non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business," as opposed to the corporation "only providing administrative staff and services for a physician's medical practice."[73]

---

[70] *See* California Business & Professions Code § 2242(a) (providing that "[p]rescribing, dispensing, or furnishing dangerous drugs . . . without an appropriate prior examination and a medical indication" constitutes "unprofessional conduct"); § 4022(a) (defining "dangerous drug" as a prescription drug, i.e., "[a]ny drug that bears the legend: 'Caution: federal law prohibits dispensing without prescription,' 'Rx only,' or words of similar import").

[71] *See* Cal. Corp. Code §§ 13405(a) (permitting a PC to "lawfully render professional services in this state, but only through employees who are licensed persons"), 13406(a) ("[S]hares of capital stock in a professional corporation may be issued only to a licensed person or to a person who is licensed to render the same professional services in the jurisdiction or jurisdictions in which the person practices, and any shares issued in violation of this restriction shall be void.").

[72] Cal. Corp. Code § 13406(a).

[73] *See* MBC CPOM Guidance.

## II.   **Fella Violates California Law by Engaging in the Unlicensed Corporate Practice of Medicine**

102.    Fella violates California's prohibition on the corporate practice of medicine in multiple ways. First, Fella's non-physician Chief Executive Officer owns and controls the professional association that provides medical services to Fella patients. Second, Fella's non-physician executives and employees regularly give patients medical advice. Third, Fella changes patient prescriptions *en masse* without any consultation from a health care provider or any indication that such changes are medically necessary.

### A.   **Both Fella and Fella Medical Group Are Owned and Controlled by Fella's Non-Physician CEO**

103.    Richie Cartwright is the founder and Chief Executive Officer of Fella—he has no medical degree nor a license to practice medicine in California or any other state.[74]

104.    Fella tricks its patients into believing that their medical care is facilitated by what Fella calls "independent medical groups."[75] In reality, Fella directs its patients towards physicians employed by Fella Medical Groups, a medical group under its direct control and influence.[76]

105.    For example, Mr. Cartwright is identified as the CEO of Fella Medical Group, P.A.'s corporate registration forms in Florida. Upon information and belief, he is also identified as a corporate officer on Fella Medical Group CA, P.C.'s corporate registration forms in California.

106.    Mr. Cartwright exerts undue control and influence on Fella Medical Groups in violation of California law. Unlicensed persons are prohibited from owning or controlling medical practices, Bus. & Prof. Code §§ 2400 *et seq.*, § 2052, or exercising undue control and influence over medical decisions. Persons in violation of these statutes also violate California's Unfair Competition Law.

---

[74] *See* LinkedIn, *Richie (Storm) Cartwright*, https://www.linkedin.com/in/richard-cartwright/ (last accessed July 21, 2025).

[75] Fella, *Terms of Use*, https://www.fellahealth.com/terms-of-use (last accessed July 21, 2025).

[76] Fella, *Terms of Use*, https://www.fellahealth.com/terms-of-use (last accessed on July 21, 2025).

**B.    Fella's Exertion of Control and Undue Influence over Telehealth Physicians' Practice of Medicine**

107.    Fella has usurped the role that physicians traditionally play in patients' lives by giving patients medical advice from non-physician employees and by changing patient prescriptions on a mass scale to maximize its profits.

**1.    Fella's Non-Physician Employees Regularly Provide Medical Advice**

108.    Fella violates California's corporate practice of medicine doctrine by virtue of the medical advice provided to patients by non-physician executives and employees.

109.    Specifically, Mr. Cartwright and two other Fella employees who do not have medical training or licenses—Jordan Pellikan and Stanley Whitaker—regularly provide patients with medical advice on social media websites and via text message.[77] Mr. Pellikan is Fella's Head of Sales and Community and Program Lead; Mr. Cartwright is Fella's Customer Success Lead.

110.    For example, Mr. Cartwright, Mr. Pellikan, and Mr. Whitaker frequently respond to Fella patients seeking medical advice on Reddit. Mr. Cartwright provides advice under the username "Current-Lime," while Mr. Pellikan and Mr. Whitaker do the same under the usernames, "These_Advertising_18" and "Super-Stuff6819," respectively. Again, none of these individuals have a medical degree or license to practice medicine in California or any other state.

111.    Yet Mr. Cartwright, Mr. Pellikan, and Mr. Whitaker do not let their lack of medical expertise stop them from regularly offering patients medical advice online, through public posts, direct messages, and public comments, and over the phone through text messages and calls.

112.    For example, one user complained that he had not seen any results after he started taking Defendants' compounded semaglutide. That same day, without any consultation with an actual medical provider, Mr. Cartwright offered to unilaterally change the user's prescription: "Fella founder here. We

---

[77] *See* LinkedIn, *Jordan Pellikan*, https://www.linkedin.com/in/jordan-pellikan-847023201/ (last accessed on July 21, 2025); LinkedIn, *Stanley Whitaker*, https://www.linkedin.com/in/stanley-whittaker-6a145526/ (last accessed on July 21, 2025).

can switch you to a personalized prescription of compounded tirzepatide. Drop me a message on (346) 214-1768 and we'll sort you."[78] The user replied, "Sent you a text."[79]



113.    In response to another user who had experienced no weight loss results after injecting Defendants' Unapproved Compounded Drugs, Mr. Cartwright offered to change the user's titration schedule, also without any medical consultation.[80] "We can definitely increase [sic] the speed of your titration if you're tolerating the medication well. Please reach out to the Careteam to get this sped up, or text me directly and I'll sort you." [81]



[80] Adayinthewater, *Semaglutide Injection*, REDDIT (Mar. 8, 2025) https://www.reddit.com/r/FellaHealth/comments/1j6t1q1/comment/mgwu6ca/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[81] Adayinthewater, *Semaglutide Injection*, REDDIT (Mar. 8, 2025) https://www.reddit.com/r/FellaHealth/comments/1j6t1q1/comment/mgwu6ca/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

114.    Another Reddit user who had made little to no progress with his weight loss while taking Defendant's compounded tirzepatide opined about switching to Defendants' compounded semaglutide. Mr. Cartwright once again conducted an illegal, virtual consultation, asking, "Have you noticed any appetite changes or side effects in the last [2 months]? They are the pre-cursor for weight loss. If not, it sounds like we need to keep ramping your dose. Please drop me a text on (346) 214-1768 and I can get you sorted."[82]



115.    Mr. Pellikan also regularly provides medical advice to Reddit users. After a Reddit user asked whether he could mix two different medicines together before injecting them and about the effects of taking certain medicines at different times, Mr. Pellikan disclaimed to the user that he was not providing him medical advice. He proceeded to do so anyway.

---

[82] JanelleMTX, *Not losing weight*, REDDIT (Apr. 7, 2025) https://www.reddit.com/r/FellaHealth/comments/1jtzdbz/comment/mm684pi/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

116.    Mr. Pellikan told the user that "[t]heortically you can [mix the medicines] because they're both water-based compounds, though 2 compounds at 1 injection site in the same pin can cause a reaction, *so I'd advise against it.*"[83] Mr. Pellikan then proceeded to instruct the user on dosing timing, saying, "anything at all that contributes to 'energy', I inject/take in the morning. I'm extremely sensitive and wouldn't want to administer too close to bed."[84]



---

[83] Senior_Yesterday_209, *Nad and Semaglutide Injection*, REDDIT (Apr. 3, 2025) https://www.reddit.com/r/FellaHealth/comments/1jqyyxd/comment/mlgagx0/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button. (emphasis added).

[84] *Id.*

117.    Four months prior, Mr. Pellikan offered medical advice to another Reddit user that had not seen any health benefits from Defendants' Unapproved Compounded Drugs purporting to contain semaglutide. He told the user, "there are some folks who don't see a great lift from the semaglutide, and so switching to the tirzepatide ends up being the unlock, which if you ever would like to discuss, please reach out to me: (469) 949-1650."[85]



Inside the image:

Fella    These_Advertising_18 · 8mo ago

Semaglutide & TRT

+1

u/Swimming-Tomato-4694 I definitely understand the frustration, and it's worth noting that an effective dosage looks different for everyone. There are still more titrations to go for you that can assist in the curbing of the appetite. Some men I've worked with didn't see steady progress until 2mg+. Everybody's different (cliche but very much the case with GLP-1s)

Relying solely on discipline/willpower alone can be an uphill climb, and to u/Inner-Assignment1162 's point, that's where the medication *should* come in to provide a stop gap, helping you form new habits + relationships with food.

However, there are some folks who don't see a great lift from the semaglutide, and so switching to the tirzepatide ends up being the unlock, which if you ever would like to discuss, please reach out to me: (469) 949-1650

Additionally, if you'd like to book in for free biweekly health coaching to assist with behavior/lifestyle changes and additional strategies, I can get you scheduled with one of our coaches. Pop me your name, reddit handle, and email over text. We're here to help get things moving for you.

Jordan
Program lead
(469) 949-1650

⬆ 1 ⬇    💬 Reply    🏅 Award    ↪ Share    ···

---

[85] Swimming-Tomato-4694, *when did you start experiencing positive result from semaglutide?*, REDDIT (Nov. 19, 2024), https://www.reddit.com/r/FellaHealth/comments/1gvdg7o/comment/ly3lhp6/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

118.     Again, another Reddit user complained that Defendants' Unapproved Compounded Drugs offered them no relief, even after weeks of injections. Mr. Pellikan provided the user with detailed answers despite not having a medical degree or license, without a clinical evaluation, or inquiring about the effects of the drug.

119.     Mr. Pellikan replied, "Folks who experience a significant shift in bodyweight on the starter dosage are more the exception in my experience. Right now, your body is already becoming more insulin sensitive due to the semaglutide, which is helping to lay the groundwork for weight loss as your dosage titrates up. That begins to start happening 'below the surface' from the very first dosage."[86]



120.     Mr. Whitaker has instructed patients on how to administer Defendants' Unapproved Compounded Drugs. He told one Reddit user who was confused by Fella's dosage instructions, "Thank you for raising this and sending a text. Due to concentration of the medication, please follow the dosage

---

[86] HuckleberryOk9994, *week 3 and no weight loss*, REDDIT (Dec. 25, 2024), https://www.reddit.com/r/FellaHealth/comments/1hm3x5z/week_3_and_no_weight_loss/.

schedule as instructed above. [P]lease start with the 25 units, then once you move to 20 units, the concentration of the medication is stronger, hence the units are lower than before."[87]

121.    Like Mr. Cartwright and Mr. Pellikan, Mr. Whitaker has made a habit of offering unqualified medical advice in violation of California state law. In response to another user that had seen no results after taking Defendants' Unapproved Compounded Drug, Mr. Whitaker reassured him, saying, "[t]he medication can take longer for some than others and sometimes it just needs a dosage increase or moving to Tirzepatide. I will go through it with you and we will come up with a way forward together."[88]

122.    Even patients are confused about who is actually the source of the "medication" that they inject into their bodies. One Reddit user and Fella customer asked, "Whom do I say prescribed this medication and is there contact information for providers to reference?"[89]



123.    Another user who experienced constipation after taking Defendants' Unapproved Compounded Drugs complained that he had received no response from Fella's "medical rep[s]" despite

---

[87] BT_37, *Dosage discrepancies*, REDDIT (Mar. 18, 2025),
https://www.reddit.com/r/FellaHealth/comments/1je51aq/comment/miga8po/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[88] LEfnGO, *WEEK 10… NOTHING,* REDDIT (Nov. 17, 2024),
https://www.reddit.com/r/FellaHealth/comments/1gt8na0/comment/lxldcvo/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[89] Smoon116, *Info for doctor?*, REDDIT (Mar. 17, 2025),
https://www.reddit.com/r/FellaHealth/comments/1jdadu8/info_for_doctor/.

repeated attempts to report his side effects.[90] From what he could tell, Fella did not "have any medical reps on their team."[91]



### 2.    Fella Manipulated Patient Prescriptions En Masse

124.    Fella's patients likely did not know who at Fella was responsible for their medical care because Fella blurred the lines between corporation and health care provider. In addition to non-physician employees regularly giving patients medical advice online and over the phone, Fella changed patient prescriptions *en masse,* disregarding the individualized clinical assessment by a licensed physician required under California law. Cal. Bus. & Prof. Code § 2242.

125.    Fella made these mass changes to patient prescriptions after FDA announced that semaglutide was no longer in shortage in April 2025, thereby limiting the circumstances in which semaglutide could be compounded.[92] In response to a Reddit user that expressed concern about how FDA's announcement would impact his supply of Defendants' Unapproved Compounded Drugs, Mr. Pellikan replied, "personalization prescriptions will continue to be provided, and existing customers are able to opt-in for up-front shipments (up to 12 months)—**importantly there will be no disruption to**

[90] Thatoneguy-huh, *Best supplement to stay regular*, REDDIT (June 8, 2025), https://www.reddit.com/r/FellaHealth/comments/1l6ngdj/comment/mx0ueoc/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[91] *Id*.

[92] Due_Conflict2455, *Compounding pharmacies ordered to stop making semaglutide*, REDDIT (Apr. 16, 2025), https://www.reddit.com/r/FellaHealth/comments/1k0uv58/compounding_pharmacies_ordered_to_stop_making/.

**anyone's treatment plan.** If you don't opt in, *we'll transition you to a personalized prescription by default that will continue to be shipped monthly.*"[93]



126.    Mr. Pellikan made the company's intentions plain: to continue to maximize its profits, Fella would flout the law at the expense of patient care. It would do so by switching patients' prescriptions to a default dosage that was ostensibly personalized, but, in reality, was not supported by any clinical evaluation, let alone a determination of medical necessity.

127.    In the same Reddit thread, another user expressed confusion in response to Fella's proposed path forward: "The [linked] article from the New York Times says to me that the prescription

---

[93] *Id.* (emphasis added).

I've been receiving will no longer be available. Fella responds by saying that I can order six months in advance. So I can stockpile a banned prescription? What do I do after six months?"[94] The user finally asked, "Will compounded semaglutide continue to be available to me on a monthly basis?"

128.    Mr. Whitaker replied to the user, explaining the finer points of Fella's scheme: "First and most importantly: **yes**, personalized prescriptions of compounded semaglutide will remain available on a monthly basis if you do not opt-in to an upfront shipment, with no additional action needed from your side…If someone does opt-in, once their supply runs out they'll be transitioned onto monthly shipments of their personalized prescription."[95]

129.    The user still did not understand because he appeared to grasp the contradiction at the heart of Mr. Whitaker's reassurances.[96] He was being told by Mr. Whitaker that he would continue to have access to his non-personalized compounded semaglutide that he received when Novo Nordisk's semaglutide medicines were in shortage; Fella would continue to sell him their Unapproved Compounded Drugs despite FDA declaring the shortage was over.

130.    Mr. Whitaker all but confirmed to the user that he would still receive his Unapproved Compounded Drugs under the guise of it being personalized. Mr. Whitaker also confirmed that Fella understood the laws they set out to break. Mr. Whitaker told the user, "Correct, commercially identical production must be halted by 503a pharmacies on April 22nd, and 503b pharmacies on May 22nd, given the shortage has been declared over by [] FDA (for now). Personalized semaglutide prescriptions (e.g. a different modality, dosage increments, and/or a different formulation with an additional ingredient like a b vitamin or amino acid alongside the semaglutide) will still be available, and will still be produced in the United States by registered compounding pharmacies."[97]

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22    131.    In a series of Reddit posts around the same time, Mr. Cartwright relayed the same

23    message to Fella customers. After one user learned that the semaglutide shortage had ended, Mr.

24    Cartwright replied, "An exact copy of semaglutide will be discontinued: April 22nd for 503a pharmacies

25    and May 22nd for 503b pharmacies. We will continue writing personalized prescriptions for

26    compounded semaglutide via 503a pharmacies after these dates. tldr = current patients will have

27

28

uninterrupted supply of medication."[98] In other words, Mr. Cartwright assured these users that they would not experience a disruption in their prescriptions because Fella would transition them to "personalized" compounded semaglutide.

132.    On information and belief, Fella made these non-medically necessary prescription changes *en masse* and without any meaningful physician consultations.

133.    Fella has a long history of making changes to patient prescriptions without their knowledge or physician approval. In late 2024, Fella switched patients' prescriptions of another compounded weight loss drug, tirzepatide, *without* additives to new formulations *with* additives, either glycine or l-arginine.[99]

134.    Mr. Whitaker explained the reasoning behind the change: "Here's what happened: Given the tirzepatide situation that unfolded this month, many pharmacies began proactively compounding tirzepatide with another amino acid or vitamin (l-arginine in [Wells pharmacy's] case). Wells is going to be reverting back and removing the l-arginine moving forward, though, as the FDA decision has been remanded for the time being."[100]

135.    Many, if not all, patients learned of these changes not from their physicians but from Fella after receiving their new prescriptions. One patient reported on Reddit, "I just received my refill for this month and it has L-Arginine added to it. Did I miss something and this was discussed because I didn't get anything telling me about it."[101]

---

[98] FloatingAboutInLyfe, *Email from Fella – Semaglutide to be discontinued April 22nd*, REDDIT (Apr. 1, 2025), https://www.reddit.com/r/FellaHealth/comments/1jp82ub/comment/mkztdv7/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[99] Superpoopiemcfarts, *From Wells pharmacy Tirzepatide + L-Arginine*, REDDIT (Oct. 23, 2024), https://www.reddit.com/r/FellaHealth/comments/1gan4mj/from_wells_pharmacy_tirzepatide_larginine/.

[100] *Id.*

[101] *Id.*

136.    Another user was incredulous: "They just added a supplement without your approval?"[102]
The first user replied, "Looks like it. I can't find anything letting me know ahead of time that this was
happening. Just showed up like that. This is the first time."[103]



137.    These combinations that purport to "personalize" are not FDA-approved nor have they
been evaluated in a clinical study for safety or effectiveness.

138.    These mass, medically dubious changes were not made without serious consequences.
One user described his symptoms after the taking the new Unapproved Compounded Drug: "I have had

---

[102] *Id.*

[103] *Id.*

(multiple) terrible reactions with L-Arginine: crippling anxiety, it puts my stomach in knots. I didn't get out of bed all day."[104]

139.    In the same post, the user made clear that he understood the corporate strategy behind Fella's illegal scheme but lamented the fact that his health was put at risk: "I understand the business model here, it's [sic] needs to be 'compound' to be made legally. But, how about a god damn heads-up about the other ingredient!"[105]



140.    In response, Mr. Pellikan acknowledged that the company had made inadequate attempts to communicate any change to their Unapproved Compounded Drugs.[106]

141.    Fella made more mass changes to patients' "personalized" prescriptions in April 2025 after briefly removing additives from its Unapproved Compounded Drugs. Once again, patients learned of this change not from their physicians or from non-physician Fella employees; instead, they learned of it only upon receiving their prescriptions.

---

[104] FonBoat, *Terrible reaction from 2nd ingredient*, REDDIT (Oct. 27, 2024),
https://www.reddit.com/r/FellaHealth/comments/1gdc886/terrible_reaction_from_2nd_ingredient/.
[105] *Id.*
[106] *Id.*

142.    For example, one Reddit user expressed his dismay at learning that glycerine had been added to his tirzepatide. The user said, "I was shipped my six month supply of Tirzepatide, but after those 24 planned injections then the product changes. Is this a workaround for compounding or is this an improvement of the product? *There's not been any communication of what this change means…*this feels murky."[107]

143.    Mr. Pellikan confirmed the user's suspicions: "To your point, this formulation therefore differs from what's commercially available, meaning it constitutes a personalized prescription. Personalized prescriptions are required for all compounded tirzepatide being shipped after the cut-off date."[108]

144.    In a separate post, another Reddit user reported similar issues to those raised by Fella customers: "I noticed in the app that my medication has now been updated to Tirzepatide + Glycine and the dosage is 0.3 ml instead of the expected 0.5 ml once I've taken all 4 doses of my initial order. Man I wish Fella would communicate better in advance. I really hope I don't regret signing up for this program. Y'all need to communicate with your customers better. I know there's a lot going on with compounded drugs, but your customers should be your first priority."[109]

---

[107] Truopio, *Product Change?!?*, REDDIT (Apr. 2, 2025),
https://www.reddit.com/r/FellaHealth/comments/1jpq6tg/product_change/.

[108] *Id.*

[109] Bryan-Alan, *Very Confused*, REDDIT (Apr. 1, 2025),
https://www.reddit.com/r/FellaHealth/comments/1jpaigm/very_confused/.

COMPLAINT



145.    The user continued, "We're talking about a prescription medication here. We don't want to randomly find out from the internet of changes to the formula/dosage. This is extremely important information that needs to be communicated to customers well in advance."[110]

---

[110] *Id.* (emphasis added).



### C. Fella Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication

146. Fella has not only violated California's prohibition on the unlicensed, corporate practice of medicine by changing patients' prescriptions *en masse*, but also by "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 [*i.e.*, a prescription drug] without an appropriate prior examination and a medical indication, [which] constitutes unprofessional conduct." Bus. & Prof. Code § 2242. Under California law, physicians must comply with "the appropriate standard of care," which, includes "a prior examination and a medical indication" that a prescription is warranted.

147. This standard of care cannot be met where company employees without medical licenses direct patient medical care and where the company manipulates compounded drug prescriptions *en masse* for business purposes without good faith, individualized clinical assessments. As described above, that is the case here.

### III. Fella Violates the Lanham Act and California Law by Engaging in False Advertising in Connection With its Sale of Unapproved Compounded Drugs

148. Despite the foregoing, Fella has made and continues to make false and misleading representations to patients regarding the nature of its Unapproved Compounded Drugs.

41

149.     Fella promotes its Unapproved Compounded Drugs by operating and advertising a telehealth clinic, including through its website.

150.     Fella has falsely advertised and continues to falsely advertise its Unapproved Compounded Drugs by making statements that describe the Ozempic®, Wegovy®, and Rybelsus® medicines but that are false or misleading when in reference to Fella's Unapproved Compounded Drugs.

151.     Fella has claimed or implied and continues to claim or imply that its Unapproved Compounded Drugs have been approved by FDA or have been reviewed by FDA for safety, effectiveness, and quality.

152.     On its website, Fella makes false and misleading representations regarding approval by FDA. It claims, among other statements, "Semaglutide, an FDA-approved medication, has been a game-changer in the world of weight-loss therapies."[111]

## Does Semaglutide Make You Bloated? Understanding the Common Side Effect

Semaglutide, an FDA-approved medication, has been a game-changer in the world of weight-loss therapies. However, as with all medicines, it too, has a set of side effects. One common concern potential users have is, "Does semaglutide make you bloated?" Let's dive into it and see what's going on.

Well, the answer is simple - **Yes**, semaglutide can cause some users to feel bloated. This is a common side effect often associated with the medication, particularly as your body adjusts to it. Just remember that everyone reacts differently to medication, and not all users will experience all side effects.

Semaglutide, like other GLP-1 drugs, works by **mimicking the functions of the body's natural hormones** that regulate appetite and insulin release. This can sometimes lead to changes in digestive function, resulting in a feeling of bloating.

---

[111] Fella, *Does Semaglutide Make You Bloated? Debunking Myths for Effective Weight Loss*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/does-semaglutide-make-you-bloated; Fella, *Exploring the Consequences: What Happens if You Inject Semaglutide into Muscle for Weight Loss?*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/what-happens-if-you-inject-semaglutide-into-muscle; Fella, *Semaglutide Tablets vs Injection: Unveiling the Best Choice for Weight Loss Success*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/semaglutide-tablets-vs-injection.

## How to Properly Administer Semaglutide Injections

Administering Semaglutide injections properly is key to achieving optimal weight loss results. Here's a step-by-step guide on how to correctly do this at home.

**Semaglutide**, an FDA-approved GLP-1 weight loss medication, is designed to be administered as a subcutaneous injection. This means it should be injected into the fatty tissue under the skin, rather than directly into your muscle tissue.

- First, wash your hands thoroughly before handling the medication. This reduces the risk of introducing bacteria into your body during the injection process.

- Next, inspect the pen device to make sure it contains semaglutide and there's enough medication left for your dose. Also, ensure its expiry date hasn't passed.

- Once you've prepared the pen, pick an injection site. It's typically recommended to inject in the fatty tissue around your belly button, but you can also use your thigh or upper arm. Wherever you select, make sure it's an area with enough fatty tissue and isn't too close to any skin scars or your belly-button.

## Semaglutide Tablets vs Injection: What's the Difference?

Semaglutide is a GLP-1 agonist that is available both as an oral tablet and an injectable solution. Both versions are FDA-approved weight management aids, but if you're debating which form of semaglutide to try, it's important to understand the key differences between the two.

Firstly, **route of administration** plays a major role in differentiating the two.

- Semaglutide tablets are orally taken, ideally at least 30 minutes before the first meal of the day. Meanwhile, the injectable semaglutide is a once-weekly subcutaneous injection, meaning it's injected into the fatty tissue under your skin.

153.    In claiming as such, the word "Semaglutide" redirects to the portion of Fella's website that outlines its purported weight loss treatments.

154.    Contrary to Fella's representations, FDA has made no such approval for a "semaglutide" peptide generally. Instead, FDA has approved three of Novo Nordisk's complete medicines, which contain semaglutide for the specific indications outlined in the preceding paragraphs.

155.    Fella's false representations mislead customers into believing, incorrectly, that the product with "semaglutide" offered by Defendants has been reviewed and approved by FDA for safety and effectiveness.

156.    Fella also has falsely claimed or implied and continues to falsely claim or imply that its Unapproved Compounded Drugs contain the same semaglutide that FDA evaluated in the context of

43

reviewing and approving Novo Nordisk's new drug applications for the Wegovy®, Ozempic®, and Rybelsus® medicines. In doing so, Fella likewise has falsely and misleadingly claimed or implied that its Unapproved Compounded Drugs are "generic" versions of the Ozempic®, Wegovy®, and Rybelsus® medicines.

157.    On its website, Fella in promotional materials misleadingly refers to Plaintiffs' FDA-approved medicines in the context of discussing Fella's Unapproved Compounded Drugs. Specifically, Fella falsely claims that "Semaglutide" is merely "marketed under the brand name Ozempic" or is "commonly known under its brand names Ozempic and Wegovy" and implies that "Semaglutide [is] the Generic Form Of" Ozempic® and Wegovy®.[112]

## Can You Take Semaglutide with Asthma Medication?

When considering a medical regimen that includes both semaglutide and asthma medication, it's essential to understand how these medications might interact. Let's dive deep and examine whether you can safely combine semaglutide with your asthma medication.

Semaglutide, marketed under the brand name Ozempic, is a GLP-1 receptor agonist used in weight management and the treatment of type 2 diabetes. Its role is to mimic the effects of natural hormone GLP-1, which helps to regulate blood sugar levels and slow down the emptying of the stomach, ultimately leading to weight loss.

On the other hand, asthma medications usually belong to two broad categories - long-term control medications, designed to maintain control over persistent asthma, and quick-relief (rescue) medications, used to treat asthma attacks. Both types work in quite distinct ways.

---

[112] Fella, *Semaglutide and Asthma Medication: Exploring the Potential Interactions for Weight Loss*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/semaglutide-and-asthma-medication; Fella, *Unraveling the Mystery: Semaglutide is Generic for What in the World of GLP-1 Weight Loss?*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/semaglutide-is-generic-for-what; Fella, *Naturally, Is Semaglutide Supposed to Be Red? – A Closer Look on GLP-1 for Weight Loss*, (last accessed on July 27, 2025) https://www.fellahealth.com/guide/is-semaglutide-supposed-to-be-red.

## What Is Semaglutide the Generic Form Of?

Semaglutide is the generic name for a revolutionary drug, commonly known under its brand names **Ozempic** and **Wegovy**. These medications are transforming the way we approach weight management.

Semaglutide belongs to a class of drugs known as GLP-1 **receptor agonists** or incretins. These medications are originally developed to manage type 2 diabetes, but physicians quickly realized they had another exciting potential: weight loss.

**GLP-1** (glucagon-like peptide-1) is a hormone your body naturally produces. Among its many roles, GLP-1 makes you feel fuller after eating, slows down your digestion, and lowers your blood sugar levels. What GLP-1 receptor agonists like semaglutide do is mimic the functions of this hormone.

## Is Semaglutide Supposed to Be Red?

Semaglutide, a GLP-1 analog weight loss treatment, has been a topic of lively discussion. Specifically, many people wonder, "Is semaglutide supposed to be red?" In this section, we'll tackle this question and discuss how the color of your medication could matter.

In actuality, **semaglutide**, which is marketed as *Ozempic* and *Rybelsus*, is not red. The liquid dosage of Ozempic is typically colorless or slightly yellow. The Rybelsus tablets are often white or off-white in appearance. So, if your semaglutide is showing up as red, it would certainly be unusual.

There are reasons why you should be **concerned** if your medication is an unusual color:

- It might indicate a counterfeit product. Always ensure to source your medication from reputable pharmacies and suppliers.

- It could suggest that the medication has been contaminated in some way.

- It might be a sign that the medication is expired or has been stored in suboptimal conditions, which can affect its effectiveness and safety.

158.    Fella's representations characterizing Ozempic®, Wegovy®, and Rybelsus® as "brand names" of "semaglutide" are misleading and falsely convey to customers that other "semaglutide" medicines have been reviewed or approved by FDA.

159.    Novo Nordisk is not directly or indirectly supplying semaglutide to Fella or any compounding pharmacies from which it may be sourcing their Unapproved Compounded Drugs.

160.    FDA has not reviewed the "semaglutide" allegedly in Fella's Unapproved Compounded Drugs for safety, effectiveness, or quality, or otherwise as equivalent in safety, effectiveness, or quality to, Novo Nordisk's medicines.

161.    Fella has no basis to compare the "semaglutide" allegedly in its Unapproved Compounded Drugs to Novo Nordisk's FDA-approved medications containing semaglutide.

162.    Moreover, Fella's characterization of Ozempic®, Wegovy®, and Rybelsus® as "brand names" of its Unapproved Compounded Drugs inaccurately suggests that Fella's semaglutide offerings are a generic version of Ozempic®, Wegovy®, and Rybelsus®. But, a "generic" in the context of prescription drugs refers to a medication that completed a specific FDA review process addressing important attributes of the drug, like safety and efficacy. FDA has not approved any generic versions of drugs containing semaglutide, much less approved Fella's Unapproved Compounded Drugs. It is therefore false for Fella to advertise its product as a generic version of Ozempic®, Wegovy®, and Rybelsus®.

163.    Fella further has falsely claimed or implied and continues to falsely claim or imply that its Unapproved Compounded Drugs have been subjected to clinical studies and trials or have otherwise achieved therapeutic outcomes attributable to the Wegovy®, Ozempic®, and Rybelsus® medicines.

164.    On its website, Fella in promotional materials refers to clinical trials that, on information and belief, did not involve the semaglutide product sold by Fella: "In clinical trials, semaglutide users lost an average of 15% of their body weight - with 1 in 3 users losing over 20%+."[113]

---

[113] Fella Onboarding Quiz, (last accessed on July 25, 2025) https://www.fellahealth.com/onboarding-quiz-m.



165.    Fella's website also, in promotional materials for its Unapproved Compounded Drugs, contain "scientific references" that redirect to the clinical studies and trials for Ozempic®, Wegovy®, and Rybelsus® medicines.[114]

---

[114] Fella, *Can I Eat Popcorn on Semaglutide? A Comprehensive Guide for GLP-1Weight Loss Journey*, (last accessed on July 27 , 2025) https://www.fellahealth.com/guide/can-i-eat-popcorn-on-semaglutide.

## Scientific References

1. An overview of randomized clinical trials of fixed-ratio combinations of basal insulin plus GLP-1RA (injectable therapy): Lessons for advancing therapy in people with type 2 diabetes - PubMed
2. Clinical Impact of Semaglutide, a Glucagon-Like Peptide-1 Receptor Agonist, on Obesity Management: A Review - PMC.
3. Complementary and Alternative Healthcare: Is it Evidence-based? - PMC.
4. Clinical Recommendations to Manage Gastrointestinal Adverse Events in Patients Treated with Glp-1 Receptor Agonists: A Multidisciplinary Expert Consensus - PMC.
5. The Effects of Soluble Dietary Fibers on Glycemic Response: An Overview and Futures Perspectives - PMC.
6. Sodium Intake and Hypertension - PMC.
7. Late-night eating: OK if you have diabetes? - Mayo Clinic.
8. Semaglutide (subcutaneous route) - Side effects & dosage - Mayo Clinic.
9. Semaglutide Patient Tips: 7 things you should know.
10. Semaglutide and Alcohol/Food Interactions - Drugs.com.
11. Effects of semaglutide on beta cell function and glycaemic control in participants with type 2 diabetes: a randomised, double-blind, placebo-controlled trial - PMC.
12. Gastrointestinal adverse events associated with semaglutide: A pharmacovigilance study based on FDA adverse event reporting system - PMC.
13. Effect of Various Dosing Conditions on the Pharmacokinetics of Oral Semaglutide, a Human Glucagon-Like Peptide-1 Analogue in a Tablet Formulation - PMC.

166.    On information and belief, Fella has not conducted any placebo-controlled or clinical studies on its Unapproved Compounded Drugs and is instead misleadingly referring to studies of Novo Nordisk's FDA-approved medicines to promote its Unapproved Compounded Drugs.

167.    On information and belief, Fella has engaged in these unlawful practices to attract customers and generate revenues and profits.

168.    Fella's false and misleading statements and practices are likely to cause mistake and deception in the marketplace.

169.    Fella's false and misleading marketing is also likely to expose patients to unnecessary risks. Patients who mistakenly believe Fella to be offering Novo Nordisk's FDA-approved medicines, or

COMPLAINT

equivalent thereto, are unlikely to understand the unique risks associated with, or the lack of clinical trials or testing establishing the safety and effectiveness of, Fella's Unapproved Compounded Drugs.[115]

170.    On information and belief, unless enjoined by this Court, Fella will continue to falsely advertise its products in violation of Plaintiffs' rights.

171.    On information and belief, unless enjoined by this Court, Fella's conduct will continue to cause mistake and deception.

### **FIRST CAUSE OF ACTION**

**(Defendant's False and Misleading Advertising and Promotion in Violation of 15 U.S.C. § 1125(a)(1)(B)) (False Statements of FDA Approval, Generic Equivalence, and Clinical Trial and Study) (Against Fella Health & Delilah, Fella Medical Group, P.C., and Fella Medical Group, P.A.)**

172.    Plaintiffs reallege and incorporate each allegation in the preceding paragraphs of this Complaint as though fully set forth here.

173.    Defendants' practices, as described in this Complaint, constitute unfair competition and false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

174.    Defendants have violated the Lanham Act by using false or misleading descriptions of fact and false or misleading representations of fact in its commercial advertising or promotion that misrepresent the nature, characteristics, and qualities of Defendant's business practices and products, as set forth above.

175.    Defendants have also engaged in other false or misleading advertising and promotion intended to assure patients that Defendants' practices are lawful. On information and belief, Defendants provide patients who purchase Defendants' Unapproved Compounded Drugs (or who Defendants are

---

[115] *See, e.g.*, Dozens Say They Lost Eyesight After Routine Surgery Using Compounded Pharmacy Drugs, WFAA, https://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (reporting mistaken belief of patient taking a compounded drug that "every pill you take, every shot you take is tested"); FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products, https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded?utm_medium=email&utm_source=govdelivery ("Compounded drugs pose a higher risk to patients than FDA-approved drugs because compounded drugs do not undergo FDA premarket review for safety, quality or effectiveness.").

trying to persuade to purchase their drugs) information that makes false or misleading statements, including those described herein and in the exhibits hereto.

176.    The above-described acts of Defendants, if not enjoined by this Court, are likely to deceive members of the general public.

177.    The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm Plaintiffs.

178.    The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

179.    By reason of Defendants' acts as alleged above, Plaintiffs have suffered and will continue to suffer injuries, including injury to Plaintiffs' business reputation.

180.    Because Plaintiffs' remedies at law are not adequate to compensate for all the injuries inflicted by Defendants, Plaintiffs are entitled to entry of preliminary and permanent injunctive relief requiring Defendants to cease their false and misleading advertising and promotion and unfair competitive practices.

181.    Because the above-described acts of Defendants are willful, Plaintiffs are entitled to disgorgement of Defendants' profits (enhanced at the Court's discretion), treble damages, and costs under 15 U.S.C. § 1117.

182.    This case is exceptional, making Plaintiffs eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

**(False Advertising in Violation of California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*) (False Statements of FDA Approval, Generic Equivalence, and Clinical Trial and Study) (Against Fella Health & Delilah, Fella Medical Group, P.C., and Fella Medical Group, P.A.)**

183.    Plaintiffs reallege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

50

184.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, prohibits false and misleading statements in connection with the sale of goods.

185.    Defendants violated this act by disseminating false and misleading statements about their Unapproved Compounded Drugs.

186.    Defendants knew or should have known these statements were false and misleading.

187.    Plaintiffs have suffered injury as a result of these violations because Defendants' false and misleading advertising has diverted business from Plaintiffs, causing lost sales and profits, and has damaged their goodwill with former, existing, and potential customers.

188.    The Court should enter preliminary and permanent injunctive relief, in addition to awarding disgorgement of Defendants' profits attributable to Defendants' statements to Plaintiffs.

## THIRD CAUSE OF ACTION

**(Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.)**
**(Unlawful Corporate Control of Practice of Medicine and Prescription Practices)**
**(Against Fella Health & Delilah, Fella Medical Group, P.C., and Fella Medical Group, P.A.)**

189.    Novo Nordisk realleges and incorporates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

190.    The violations of law described in this Complaint have been, and are being, carried out and directed wholly or in part within the County of San Francisco and other locations within the State of California where Fella Health does business.

191.    California Business and Professions Code § 17200 prohibits "unlawful, unfair or fraudulent business practices."

192.    Fella Health has violated California's Unfair Competition Law by engaging in the unlawful business practices that Fella Health employs to promote and sell their Unapproved Compounded Drugs in violation of California law.

193.    Fella Health has engaged and continues to engage in unlawful and unfair business acts or practices in violation of Section 17200. Such acts and practices include the following:

- Unlawfully engaging in and aiding and abetting the unlawful Corporate Practice of Medicine within the State of California in violation of Business & Professions Code §§ 2400, 2502 *et al.*

- Unlawfully prescribing medications without an appropriate prior examination by a physician and without the identification of a medical indication for the modification. *Id.*

- Unlawfully prescribing drugs without conducting a good-faith exam.

194.    The business practices that Fella Health has employed to promote and sell Unapproved Compounded Drugs constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law. Such practices include permitting corporate interests to exert undue control over aspects of the physician-patient relationship, as described in Section II. The business practices further constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law by adding and modifying additives to drug products without examining the patient, and by prescribing oral and injectable drug products Defendants know are not personalized.

195.    Likewise, Fella Medical Group, P.C. and Fella Medical Group, P.A. ("Fella Medical Groups") have aided and abetted Fella Health's unlawful corporate practice of medicine by following its directives as an unlicensed corporate entity in violation of California Business & Professions Code §§ 2400, 2502 *et al.*

196.    Fella Health's unfair and unlawful conduct (and Fella Medical Groups' aid in perpetuating this unlawful conduct) is interfering with Novo Nordisk's ability to conduct its business. As a direct and proximate result of Fella Health's false and misleading campaign, Novo is suffering immediate and continuing, competitive, irreparable injury for which there is no adequate remedy at law.

197.    As a direct and proximate result of Fella Health's deceptive and unlawful practices, Fella Health has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Novo Nordisk's semaglutide medicines. Novo Nordisk has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

198.    Novo Nordisk is entitled to all remedies available under California's Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

**FOURTH CAUSE OF ACTION**

**Unfair Competition in Violation of the Common Law (Against Fella Health & Delilah, Fella Medical Group, P.C., and Fella Medical Group, P.A.)**

199.    Plaintiffs reallege and incorporate each  allegation in the preceding paragraphs of this Complaint as though fully set forth here.

200.    The above-described acts of Defendants constitute common law unfair competition.

201.    The above-described acts of Defendants unfairly and wrongfully exploit Plaintiffs' goodwill and reputation.

202.    The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

203.    Because Plaintiffs' remedies at law are not adequate to compensate for the injuries inflicted by Defendants, Plaintiffs are entitled to entry of preliminary and permanent injunctive relief, in addition to monetary relief in the form of disgorgement of Defendants' profits and corrective advertising costs.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Fella as follows:

1.    That the Court enter a judgment against Fella Health & Delilah, Fella Medical Group, P.C., and Fella Medical Group, P.A. that they have:

    a.    Engaged in false and misleading advertising and promotion, in violation of 15 U.S.C. § 1125(a);

    b.    Engaged in unfair and deceptive trade practices under the common law of California and violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq*., and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

2.    That each of the above acts was willful.

3.    That the Court preliminarily and permanently enjoin and restrain Defendants and their agents, servants, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from:

    a.    using the Ozempic®, Wegovy®, and Rybelsus® marks, including (i) use in any manner likely to cause confusion or mistake, to deceive, or otherwise infringe Novo Nordisk's rights in the Ozempic®, Wegovy®, and Rybelsus® marks, or (ii) use in connection with the advertising, marketing, sale, or promotion of any Unapproved Compounded Drugs; and,

    b.    advertising, stating, or suggesting that any Unapproved Compounded Drugs, including any Unapproved Compounded Drugs that either are available, directly or indirectly, from or through Defendants or the use of which or access to which is facilitated by, or with the involvement of, Defendants:

       i.    are, or contain, genuine or authentic Novo Nordisk Ozempic®, Wegovy®, or Rybelsus® medicines;

       ii.    are sponsored by or associated with Novo Nordisk;

      iii.    are approved by FDA; have been reviewed by FDA for safety, effectiveness, or quality; or have been demonstrated to FDA to be safe or effective for their intended use;

      iv.    achieve or have been shown or proven to achieve therapeutic results, effects, or outcomes, including but not limited to by relying on or making reference to clinical trial results for Novo Nordisk's medicines;

      v.    achieve or have been shown or proven to achieve therapeutic results, effects, or outcomes similar or identical to Novo Nordisk's medicines or are interchangeable with or equivalent to genuine Novo Nordisk medicines;

      vi.    are associated or connected in any way with Novo Nordisk or Novo Nordisk's medicines; or

54

vii.     contain any ingredient (including semaglutide) that is supplied by Novo

Nordisk, is approved by FDA, or is the same as any ingredient in any

Novo Nordisk medicine.

c.     engaging in unfair and deceptive trade practices with respect to Novo Nordisk's

Ozempic®, Wegovy®, or Rybelsus® medicines; and

d.     engaging in deceptive acts or practices with respect to Novo Nordisk's Ozempic®,

Wegovy®, or Rybelsus® medicines.

4.     That the Court require Defendants to disclose conspicuously and prominently in any

public-facing materials for any Unapproved Compounded Drugs, including all advertising, marketing,

and promotional materials, that: (a) the Unapproved Compounded Drugs are compounded drugs that

have not been approved by FDA; have not been reviewed by FDA for safety, effectiveness, or quality;

and have not been demonstrated to FDA to be safe or effective for their intended use; (b) the processes

by which the compounded drugs are manufactured have not been reviewed by FDA; and (c) FDA-

approved medicines containing semaglutide are available.

5.     That Plaintiffs be awarded monetary relief in the form of disgorgement of Defendants'

profits for Defendants' false advertising and unfair and deceptive trade practices with respect to Novo

Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines and that this monetary relief be trebled due to

Defendants' willfulness, in accordance with 15 U.S.C. § 1117 and any applicable state laws.

6.     That the Court award disgorgement to Plaintiffs of Defendants' profits resulting from

Defendant's unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®,

or Rybelsus® medicines.

7.     That Defendants be ordered to account for and disgorge to Plaintiffs all amounts by which

Defendants have been unjustly enriched by reason of Defendants' unlawful actions with respect to Novo

Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

8.     That Plaintiffs be awarded punitive damages by reason of Defendants' willful

unlawful actions with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

9.     For pre-judgment and post-judgment interest on all damages.

10. That the Court award Plaintiffs their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and any other applicable provision of law.

11. That the Court award Plaintiffs the costs of suit incurred herein.

12. For such other or further relief as the Court may deem just and proper.


JURY DEMANDED


August 4, 2025                              Respectfully submitted,


                               By: */s/ Nathan E. Shafroth*

                                   Nathan E. Shafroth (Bar No. 232505)
                                   nshafroth@cov.com
                                   COVINGTON & BURLING LLP
                                   Salesforce Tower
                                   415 Mission Street, Suite 5400
                                   San Francisco, California 94105-2533
                                   Telephone: + 1 (415) 591-6000
                                   Facsimile: +1 (415) 591-6091

                                   Kevin B. Collins (*pro hac vice pending*)
                                   kcollins@cov.com
                                   COVINGTON & BURLING LLP
                                   One CityCenter
                                   850 Tenth Street, NW
                                   Washington, DC 20001-4956
                                   Telephone: + 1 (202) 662-5598

                                   Chase Woods (*pro hac vice pending*)
                                   cwoods@cov.com
                                   COVINGTON & BURLING LLP
                                   One CityCenter
                                   850 Tenth Street, NW
                                   Washington, DC 20001-4956
                                   Telephone: +1 (202) 662-5889


                                   ***Attorneys for Plaintiffs NOVO***
                                   ***NORDISK A/S and NOVO***
                                   ***NORDISK INC.***